Filed 2/26/13  Ischemia Research and Ed. Found. v. Pfizer, Inc. CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ISCHEMIA RESEARCH AND EDUCATION FOUNDATION, Plaintiff and Appellant, v. PFIZER INC., et al., Defendants and Appellants. | H034653 (Santa Clara County Super. Ct. No. CV026653) |

Plaintiff Ischemia Research and Education Foundation (IREF) appeals from the trial court's order granting a new trial to defendant Pfizer Inc. (Pfizer) on liability and defendant Dr. Ping Hsu (Hsu) on damages after a jury returned a $38 million verdict in IREF's favor in IREF's misappropriation of trade secrets action against Pfizer and Hsu. IREF contends that (1) the trial court's order is void because the statutory period for ruling on the new trial motions had expired before the court issued its order, (2) the statutory provision permitting a trial court to grant a new trial for insufficiency of the evidence is unconstitutional, (3) the trial court's order was an abuse of discretion, and (4) the trial court's decision not to award exemplary damages (an issue upon which it granted IREF a new trial) was an abuse of discretion.  Pfizer and Hsu have filed protective cross-appeals.  We reject IREF's contentions and affirm the trial court's order.  Therefore, we need not address the cross-appeals.

## I. Factual Background

IREF is a nonprofit corporation that collects and analyzes data from clinical trials, which it stores in databases. Dr. Dennis Mangano is a physician, the founder of IREF, and its "principal scientist." Beginning in 2001, he also served as IREF's chief executive officer (CEO). Mangano is very experienced in conducting clinical trials. There are three types of clinical trials. A pharmaceutical company may sponsor a trial; the National Institutes of Health (NIH) may sponsor a trial; or an independent entity, such as IREF, may initiate a trial. Mangano formed a group of physician investigators, called McSPI, who represented the leading cardiac surgery centers. McSPI is an acronym for multi-center study of perioperative ischemia. Perioperative means before, during, or after surgery. Ischemia refers to an organ's lack of oxygen. Mangano's plan was to have these investigators contribute data to a database.

The McSPI investigators joined together and did an observational study of 2,417 cardiac artery bypass graft (CABG) surgery patients.[1] An observational study simply observes the history of patients as they go through surgery and during their hospitalization thereafter, while a clinical trial tests a drug or technique. The McSPI investigators collected 3,000 pieces of data per patient in this study, and this data was used to create a database called EPI-1. "EPI" stands for epidemiology. It took IREF two years to input and check the accuracy of this data. EPI-1 was owned by IREF, and no other database contained this type of information at this level of detail. After all of the data was inputted and checked, the EPI-I database was "locked" so that it could provide a basis for publishable work. EPI-1 was locked in 1995.

Clinical trials of a drug called acadesine were conducted by IREF between 1990 and 1994. Acadesine was intended to help the body protect itself from a heart attack. The clinical trials of acadesine involved CABG patients. IREF was paid $30 million by

---

[1] There were 24 centers, and each of them observed approximately 100 patients.

Gensia, the developer of acadesine, to do these clinical trials of the drug. IREF also received the right to publish the research without constraints.[2] IREF's agreements provided that IREF would have joint ownership over the placebo data, which involved 2,700 patients. The acadesine studies collected 2,000 pieces of data per patient. IREF was granted the right to the acadesine databases created from these clinical trials, which included all 4,000 patients involved in the trials.[3]

IREF participated in a second observational study of CABG patients known as the EPI-2 study. The EPI-2 observational study was a worldwide, 70-center study of over 5,000 CABG patients in 17 countries that collected more than 11,000 pieces of data per patient. The EPI-2 database was locked in late 2001. There are no other databases in the world that contain this kind of information.

IREF stored all of its databases on a server, which was kept in a locked room and was password-protected. This server contained the EPI-1 database, the EPI-2 database, and the acadesine databases.[4]

Pfizer is a pharmaceutical company. In 1999, Pfizer[5] was developing two drugs, parecoxib and valdecoxib. Valdecoxib was also known by the brand name Bextra. Bextra and parecoxib are nonsteroidal anti-inflammatory drugs (NSAIDs) called COX-2

---

[2]     IREF always insisted on the right to publish the research it did on behalf of a company.

[3]     Mangano testified at trial that Schering-Plough owned the acadesine databases "with rights to publish by IREF." He explained that Schering-Plough had acquired ownership of the databases in 2007 with the exclusion of the rights involved in this litigation.

[4]     There are five acadesine databases.

[5]     The original developer of parecoxib and Bextra was Searle, which merged with Pharmacia and then became part of Pfizer. Although the entity involved was, at some points, Searle, and, at other points, Pharmacia, Pfizer is the entity that inherited any liability. For ease of reference, we will refer to the developer of parecoxib and Bextra as Pfizer regardless of whether it was actually Searle or Pharmacia at the time in question.

3

inhibitors.[6] Pfizer wanted to be able to market Bextra and parecoxib to be used for acute pain, such as after surgery. The United States Food and Drug Administration (the FDA) requires clinical trials of drugs before it will consider approving them. Clinical trials are done to determine both whether a drug is effective and whether it has dangerous side effects.

Pfizer contracted with IREF in 1999 and paid IREF more than $4 million for IREF's assistance in designing and conducting one of Pfizer's studies of Bextra and parecoxib. This study was a clinical trial called CABG I that was conducted in 2000. The CABG I contract obligated IREF to utilize its databases to provide responses to questions from Pfizer regarding CABG I. IREF referred to this as "productive access" to its databases. Under its contract with Pfizer, IREF received the right to the placebo data and the right to publish the results of the study, as was IREF's normal practice to require. CABG I was conducted using McSPI. Over $2 million of the money paid to IREF by Pfizer went to the McSPI investigators. The amount that IREF retained amounted to $4,368 per patient. Pfizer employee Dr. Richard Charles Hubbard was in charge of CABG I, and Pfizer employee Dr. Michael Snabes was also involved in CABG I.

Hsu was an employee of IREF from 1999 to 2004.[7] Hsu was a biostatistician, and he served as IREF's director of biometrics. When he began working for IREF, he signed

_____

[6] Parecoxib is a slightly different form of the same molecule in Bextra. Parecoxib is given as an injection, while Bextra is given in tablet form. Once the body metabolizes them, they are identical. COX stands for "Cyclooxygenase." Traditional NSAIDs are nonselective, which means that they inhibit both COX-1 and COX-2. COX-2 inhibitors are NSAIDs that are selective and inhibit only COX-2. COX-1 is an enzyme that protects the lining of the stomach. Thus, the potential advantage of a COX-2 inhibitor is that it possibly would not damage the stomach's lining.

[7] During part of that time, Hsu actually worked for Gentiae. Until 2001, Gentiae was an unincorporated division of IREF. In 2001, Gentiae was incorporated and became IREF's wholly owned, for-profit subsidiary. IREF and Gentiae often worked together. During the relevant time period (2002 to 2004), Hsu was employed by IREF. After 2003,

4

an agreement promising to protect the confidentiality of IREF's intellectual property. Hsu worked on CABG I and participated in the analysis and drafting of IREF's manuscript on CABG I.

CABG I studied 462 patients, 311 of whom received the drugs, and 151 of whom received the placebo. As a result of CABG I, the FDA had concerns about adverse events associated with parecoxib and Bextra.[8] These concerns were heightened by the controversy at that time over the risks associated with a drug called Vioxx, which was another COX-2 inhibitor. In July 2001, the FDA notified Pfizer that it would not approve parecoxib without further studies due to concerns about the drug's effectiveness and safety. Bextra was approved by the FDA for arthritis and menstrual pain, and Pfizer began marketing it in 2001. Bextra was not approved for acute pain. CABG I had "demonstrated an excess of serious adverse events, including death," associated with parecoxib and Bextra. Pfizer needed to do further studies if it wanted to obtain approval of parecoxib and approval of Bextra for acute pain.

IREF submitted a manuscript for publication of the CABG I results in November 2001, but IREF's manuscript was not ultimately published until June 2003.[9]

---

Gentiae became partially owned by entities other than IREF. Gentiae's business was running clinical trials.

[8] Adverse events are "everything bad that happens to a patient" during the course of a clinical trial. Not all adverse events are considered in the results of a clinical trial. Only those adverse events that are "adjudicated" by a committee as clinically relevant adverse events (CRAEs) are considered. CRAEs are supposed to be those adverse events that potentially could have been related to the study drug. For instance, an adverse event occurring before the drug or placebo is administered would not be considered a CRAE. The CRAE committee is independent of the drug sponsor. Mangano was concerned that many of the adverse events that occurred during CABG I had been discounted and not reported as CRAEs.

[9] According to Mangano, Pfizer was "very, very angry" when IREF decided to publish the results of CABG I. Indeed, Pfizer was concerned about the manuscript and was considering how it could counter the manuscript's assertions. However, these issues

In December 2001, Pfizer approached IREF about participating in another clinical trial of parecoxib and Bextra. This new study, which would be called CABG II, would need to be a much larger version of CABG I. On January 9, 2002, both Hubbard, who was in charge of designing CABG II for Pfizer, and Mangano participated in a telephone conference during which possible outcomes of a three to five-arm CABG II, potentially including an NSAID-comparator arm, were discussed.

Mangano told Pfizer that IREF would charge about $10,000 per patient for IREF's help in designing the protocol for CABG II. A study protocol is a "roadmap" for the conduct of the study. He recommended that the trial would need to be "event-driven" and therefore continue to enroll patients until there were "a certain number of adverse events." Pfizer preferred to have a "fixed number of patients." Given that preference, Mangano recommended that they would need to enroll at least 4,500 patients in the trial. Mangano anticipated that an "intensive two-week effort" would be required of IREF to help design the study protocol.

In mid-January 2002, Mangano sent to Pfizer a proposed contract for the CABG II study. The contract proposed for IREF to assist Pfizer in the design of the study by using information from IREF's EPI-1 and EPI-2 databases. The EPI-2 database had a large amount of information about other NSAIDs. IREF was not willing to agree to a database access only or "a la carte" deal. IREF did not offer to provide productive access to the acadesine databases.[10] Mangano proposed that Pfizer pay IREF $10,081 per patient, which was anticipated to amount to about $15 million to $25 million for the 1,500 to 2,500 patients in the study. Mangano based the $10,081 amount on prior studies where

were apparently resolved in early December 2001 to the satisfaction of all. Eventually, everyone agreed on the content of the manuscript, and IREF and Pfizer employees were co-authors.

[10] According to Mangano, IREF would have charged another $12,500 per patient for productive access to the acadesine databases.

6

IREF had been paid between $4,500 and $32,000 per patient. The proposed contract also provided that IREF would receive the placebo data and publication rights. IREF's involvement would only be on the front end, and the entire study would be over in less than a year.

In late January 2002, while negotiations were underway between IREF and Pfizer, Hubbard asked Mangano "about the possibility of probing IREF's databases for information regarding NSAIDs." Apparently, Mangano did not reply. At the time of Hubbard's inquiry, Pfizer and the FDA were negotiating about whether there should be an NSAID-comparator arm in the CABG II study. By the end of January, Pfizer and the FDA had decided not to have an NSAID-comparator arm.[11]

In late January 2002, Hubbard told Mangano that Pfizer would not accept the initial IREF proposal. Negotiations continued between IREF and Pfizer and included IREF's for-profit subsidiary Gentiae. IREF submitted a new, more limited proposal, which still included productive access to the databases, and would have charged Pfizer $5,525 per patient. Pfizer did not accept this proposal either. But they continued to negotiate in February 2002.

Pfizer sent the FDA a study protocol on February 14, 2002. This protocol contemplated two arms, one with parecoxib/Bextra, and the other a placebo arm, with 500 patients per arm. By February 18, Pfizer had decided that it did not need access to IREF's databases. Another proposal was made by IREF that would have involved a payment of $3,628 per patient. This too was rejected by Pfizer. Ultimately, at the end of February, Pfizer accepted a more limited proposal from Gentiae for $1,853,000 that did

---

[11]     The reason for this decision was that the only intravenous NSAID available to use as a comparator had "high risks" and "extensive limitations to its use." That NSAID also could not be used with aspirin, which would be used in CABG II.

not involve database access. Although the final contract was with Gentiae, Mangano was involved in Gentiae's work on CABG II.

In early March 2002, Hubbard contacted Hsu about serving on Pfizer's independent data monitoring committee (IDMC) for CABG II. An IDMC is usually necessary for a blinded clinical trial such as CABG II.[12] The purpose of an IDMC is to serve as an independent "watchdog" over the trial. The members of the IDMC are experts who do not work for the company that is conducting the trial.

In April 2002, Mangano learned from Hsu that Hsu had been asked by Pfizer to serve on the IDMC for CABG II. Mangano thought it would be a good opportunity for Hsu to "support his career," and he viewed Hsu's role as "extremely narrow" because an IDMC reviews the data only "as it drips down from the study." Mangano believed that Hsu's service on the IDMC would consume only an hour or two per month. Because an IDMC is supposed to be independent of the company conducting the trial, Mangano did not expect Hsu to have any contact with Pfizer. Mangano told Hsu that he should submit his IDMC contract with Pfizer to the IREF board for its review. Mangano also reminded Hsu in writing that he "cannot use any of IREF's intellectual property for [Pfizer's] purpose." Mangano told Hsu that he could "not say anything about the databases, period." Hsu told Mangano that he would comply with these conditions, but he never submitted his contract to the IREF board.

In April 2002, Hsu sent an e-mail to several Pfizer employees including Snabes, who was serving as one of Pfizer's study directors on CABG II, and Hubbard informing them that he was available to serve on the IDMC. Hsu told them in this e-mail: "I cannot use IREF's intellectual property for [Pfizer's] purpose." Snabes responded: "One area in this regard is that we were considering being able to take advantage of your access to the

---

[12] A blinded clinical trial is one in which no one involved in the trial knows which patients are receiving the placebo.

IREF databases when we are looking at AE [adverse event] rates. So are you saying that this now OFF the table as an option." Hsu responded: "If you need advice on where to find the data to answer your question, I can provide that to you. If you want [an] opinion on the usefulness of certain databases, I can provide that too i.e. whatever I know. If you want to access IREF databases, you will need to include that in the contract with IREF/Gentiae."

Pfizer continued to revise its study protocol over the next six months. In September 2002, a Pfizer employee sent an e-mail to Hsu and two other IDMC members seeking data about the expected rate of adverse events one day after surgery in a population similar to that being studied in CABG II, which was part of the population studied in EPI-2. Hsu responded that this analysis could be done only from the EPI-2 database. Hsu suggested that Pfizer look at Mangano's published aspirin paper. In 2002, Mangano had published an article in the New England Journal of Medicine about aspirin and mortality in CABG surgery. This article was based on the EPI-2 database. Hsu also said in his e-mail that he "will bring that statistics with me, hopefully it will be helpful." The aspirin paper did not contain statistics regarding the expected rate of adverse events in this population.

Pfizer proceeded with its CABG II clinical trial and ultimately enrolled 1,671 patients in the study, which had three arms.[13] The third arm was placebo/Bextra. In May 2003, Pfizer inquired of Mangano whether IREF would be interested in writing a manuscript using IREF's EPI-2 database. IREF had done something similar for another pharmaceutical company for $3 million. IREF sent a proposal to Pfizer offering to do so

---

[13] The ultimate result of the study was that neither drug was approved for acute pain due to a statistically significant number of adverse cardiovascular events. Bextra was ultimately withdrawn from the market at the recommendation of the FDA in 2005 due to reports of serious, life-threatening skin reactions.

for $7.5 million. Pfizer, which wanted IREF's assistance "for free," did not respond to IREF's proposal.

In September 2003, Hsu asked for and received a raise from IREF. Shortly thereafter, he sought to establish a system of bonuses. After the salary and bonus issues were resolved, Hsu sought an ownership interest in the company that was developing acadesine. That company, AGTC, was owned by Mangano and his wife. IREF had done some work for AGTC, for which AGTC reimbursed IREF. Mangano became irritated at the tone of Hsu's requests, even though Mangano was amenable to the substance of them. In October 2003, Hsu performed paid consulting work for another company without IREF's knowledge. In December 2003, unbeknownst to IREF and Mangano, Hsu entered into a consulting agreement with another company.

In late 2003 and early 2004, Mangano and Hsu engaged in a series of heated e-mail exchanges. On February 4, 2004, Hsu sent an e-mail to many of the McSPI investigators implicitly accusing IREF of improprieties and stating that he would be leaving his job at IREF on February 13, 2004. When Mangano learned of this e-mail, he was angry. On the night of February 5, Mangano went into Hsu's IREF office and looked at Hsu's desktop computer to see what else Hsu had sent to McSPI investigators. The computer had been left on, and Mangano did not need a password to access it. Mangano discovered, to his surprise, "a lot of e-mail traffic with Pfizer." Looking more closely, Mangano found that Hsu's computer contained files that appeared to be associated with Pfizer that contained analyses of the EPI-2 database.[14] These files were from February and August 2002. Some of the analyses on Hsu's computer concerned NSAID use in CABG patients. Hsu had been communicating by e-mail with Snabes and

---

[14] One of these files was a "power analysis." A "power analysis" attempts to "use information available before the study starts to predict what the outcomes of the study may be and then calculate how many patients need to be enrolled in the study in order to prove that the outcome is the one you wanted."

10

Hubbard throughout this period. Mangano had an IT person download Hsu's files so that he could examine them in more detail.

On February 17, 2004, Mangano set up a meeting with Hsu for the following day. At the meeting, Mangano asked Hsu to explain his interactions with Pfizer. Hsu did not provide satisfactory answers. Mangano placed Hsu on paid administrative leave. On February 21, 2004, Hsu burned numerous "business" files from his laptop computer to CD and deleted more than 200 files from his laptop computer. Hsu also deleted a folder of files on IREF's server. In addition, Hsu attempted to delete the CD creation logs from February 21 by placing the log files in the recycle bin. One of the files that was deleted and burned to a CD was called "EPI-2 summary.doc." Another file was called "Searle 1.doc" and a third was called "EPI-2 sum-Searle.doc."[15] The "Searle 1.doc" had been created in August 2002, at a time when Hsu would have had no legitimate reason to be probing EPI-2 for that information.

Mangano terminated Hsu's employment after he came to the conclusion that Hsu "was effectively stealing data from the foundation, from our principal databases, the gold of the foundation, and using it to help Pfizer in a study of a major drug, Bextra." Hsu had taken data from the EPI-1, EPI-2, and acadesine databases. Mangano believed that Hsu's probing of IREF's databases and communications with Hubbard tracked Pfizer's development of its protocol for CABG II. Mangano also concluded that Hsu had used IREF's database to analyze other issues that were being considered by the IDMC and by Pfizer.

---

[15]     As noted earlier, Searle was Pfizer's predecessor in interest.

11

## II. Procedural Background

In 2004, IREF and Mangano filed an action against Pfizer and Hsu for misappropriation of trade secrets. In October 2007, Mangano executed a written assignment of his rights in this litigation to IREF.

At Pfizer's request, the trial court bifurcated the issue of the amount of exemplary damages.

IREF's expert Sam Leopold Teichman testified at trial that the IREF data accessed by Hsu would have been useful to Pfizer in connection with CABG II. IREF's damages expert Jimmy Joe Jackson testified at trial as an expert on the quantification of damages. Jackson asserted that Pfizer would have paid $14.7 million for productive access to IREF's EPI-1 and EPI-2 databases in 2002 if it had not misappropriated information from those databases. He also opined that Pfizer would have paid an additional $15 million for productive access to those databases during a 10-month "extension" in 2003.[16] Jackson further testified that Pfizer would have paid $16 million for productive access to the acadesine databases. Jackson also valued the "lost placebo data" that IREF would have obtained if it had contracted with Pfizer at $8 million. He made no attempt to determine a damages figure that did not combine the damages attributable to the conduct of both Hsu and Pfizer. Pfizer's damages expert Alan Ratliff testified that, if Pfizer was found liable, IREF's damages "would be a range somewhere between [$]100,000 and [$]330,000."

At the close of evidence, Pfizer and Hsu moved for a directed verdict, but the court denied their motions. The jury returned a special verdict in favor of IREF. It unanimously found that both Hsu and Pfizer had misappropriated IREF's trade secret

---

[16]     The original proposal by IREF in January 2002 covered only that calendar year.

12

databases in February 2002. The jury set the damages at over $38 million.[17] The damages findings were not unanimous; the jury voted 10-2. The jury also found by clear and convincing evidence that the misappropriation by both Pfizer and Hsu was "willful and malicious." The jury was unanimous on this finding as to Hsu but voted 10-2 as to Pfizer.

In January 2009, IREF filed a motion seeking exemplary damages under Civil Code section 3426.3, subdivision (c). In March 2009, the court denied the motion. On May 5, 2009, the court entered judgment. The judgment provided that IREF would recover from Pfizer and Hsu "jointly and severally" more than $38 million plus prejudgment interest of more than $19 million.

All parties sought a new trial.[18] The trial court issued an order vacating the judgment, granting Pfizer's motion for a new trial on liability, granting Hsu's motion for a new trial on damages, and granting IREF's motion for a new trial on exemplary damages. IREF timely filed a notice of appeal from the trial court's order granting the new trial motions and from the judgment "insofar as the Judgment fails to award exemplary damages . . . ." Pfizer timely filed a notice of cross-appeal from the new trial order and the judgment. Hsu timely filed a notice of cross-appeal from the court's order denying his JNOV motion and from the judgment.

---

[17] In answer to the question: "Did IREF suffer any actual loss or was Pfizer unjustly enriched?" the jury responded affirmatively. The jury specially found that the misappropriation was a substantial factor in "causing actual loss to IREF or unjust enrichment to Pfizer" and that the actual loss to IREF was over $38 million. The jury was also asked: "Without double counting any actual loss damages you awarded (if any) . . . , by what amount (if any) was Pfizer unjustly enriched by the misappropriation of IREF's trade secrets?" The jury responded that it was no amount.

[18] At the same time, Hsu and Pfizer also served and filed notices of intent to move for judgment notwithstanding the verdict (JNOV). These motions were denied and are not at issue on appeal.

### III.  Discussion

### A.  Timeliness of New Trial Order

### 1.  Background

Mangano was a party to this lawsuit when it was filed in 2004, but he assigned his rights to IREF in October 2007.  IREF filed a notice of this assignment with the court in October 2007.  The notice stated that "this action shall continue with IREF as the sole Plaintiff."  During voir dire in 2008, the court and the parties discussed the fact that Mangano had assigned his interest in this action to IREF but had not yet been "formally . . . dismissed as a party."  The court then orally ordered that "Mangano will be dismissed as a plaintiff.  The remaining plaintiff will be [IREF]."  Mangano testified at trial that he had assigned all of his rights in this action to IREF in October 2007.  He testified:  "I've dropped out of this as a plaintiff.  I assigned everything to the foundation."  Mangano was not listed as a plaintiff on the jury's special verdict forms.

On May 5, 2009, the court entered judgment in favor of IREF.  The clerk of the superior court filed a proof of service of the judgment on that date stating that "a true copy of" the judgment "was served" on the parties.

At a May 8, 2009 hearing, the court said:  "You all received a copy of the judgment that I cranked out ultimately a little earlier this week, I believe.  I do want to state for the record that I did not order the clerk to send out a notice of entry of judgment.  That was not a notice of entry of judgment; that was just a service of the judgment on the parties.  [¶]  So I believe that one of the things we're going to be talking about this morning is the timing for the filing of any motions for new trial.  And so at this point there has been no notice of entry of judgment prepared or served. . . .  [¶]  My concern, of course, here, ultimately is that once a notice of intention to move for new trial is filed, the Court only has 60 days in which to rule on those motions.  So, at this point, I guess I can ask the plaintiff:  Has a notice of entry of judgment been sent out?"  IREF's attorney replied:  "It hasn't been done."

14

The court proceeded to discuss scheduling. "Do we want to talk about a schedule for a hearing on the motions for new trial? I mean, at this point we don't know precisely when the last day is going to be. But if you indicate you're going to mail your notice of entry of judgment no later than Monday, I believe a notice of intention to file a motion for new trial has to be filed within 15 days of the date of the service of the entry of judgment; so I think that's 15. If it's going to be served by mail, it would be 20 days. [¶] . . . I just want to make sure the hearing date is scheduled so that I have enough time to consider everything that's raised at the hearing before I have to rule." The attorneys agreed to "try to work out something that coordinates" with the court's schedule, which was limited.

On May 20, 2009, the parties stipulated in writing to a schedule for posttrial motions, which was approved by the court. This stipulation provided that IREF "will serve its notice of entry of judgment on June 1, 2009 (which will trigger the 60-day deadline in CCP § 660 and the filing deadline for IREF's memorandum of costs and motion for attorneys fees)." It further identified the dates upon which the notices of intent and the motions for new trial and JNOV would be filed by each party. Finally, it provided that the court "will hold oral argument on July 17, 2009" and "will have jurisdiction to render its decisions until July 31, 2009 (the last of 60 days allowed under CCP § 660)."

On June 1, 2009, IREF filed and served a notice of entry of judgment on counsel for Hsu and Pfizer. On June 16, 2009, both Pfizer and Hsu filed and served separate notices of intent to move for a new trial. On June 26, 2009, IREF also filed and served a notice of intent to move for a new trial. The court held oral argument on the motions on July 17, 2009. At the end of the hearing, the court asked: "And what's my -- what are my deadlines, here? I know I have a deadline on the motion for new trial. Is that the end of this month?" Pfizer's attorney replied: "July 31st, Your Honor." Hsu's attorney agreed. IREF's attorney said nothing.

15

On July 30, 2009, the trial court issued an order vacating the judgment, granting Pfizer's motion for a new trial on liability, granting Hsu's motion for a new trial on damages, and granting IREF's motion for a new trial on exemplary damages.

## 2. Analysis

"Except as otherwise provided in Section 12a of this code, the power of the court to rule on a motion for a new trial shall expire *60 days from and after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier*, or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial.  If such motion is not determined within said period of 60 days, or within said period as thus extended, the effect shall be a denial of the motion without further order of the court."  (Code Civ. Proc., § 660, italics added.)

Code of Civil Procedure section 664.5 provides:  "(a) In any contested action or special proceeding other than a small claims action or an action or proceeding in which a prevailing party is not represented by counsel, the party submitting an order or judgment for entry shall prepare and mail a copy of the notice of entry of judgment to all parties who have appeared in the action or proceeding and shall file with the court the original notice of entry of judgment together with the proof of service by mail.  This subdivision does not apply in a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation.  [¶]  (b) *Promptly upon entry of judgment in a contested action or special proceeding in which a prevailing party is not represented by counsel, the clerk of the court shall mail notice of entry of judgment* to all parties who have appeared in the action or special proceeding and shall execute a certificate of such mailing and place it in the court's file in the cause.  [¶]  (c) For purposes of this section, 'judgment' includes any judgment, decree, or signed order from which an appeal lies.  [¶]  (d) Upon order of the

16

court in any action or special proceeding, the clerk shall mail notice of entry of any judgment or ruling, whether or not appealable." (Code Civ. Proc., § 664.5, italics added.)

IREF's contention is that the trial court's ruling on the new trial motion was void because the clerk's May 5, 2009 mailing of the judgment to the parties was a "notice of entry" under subdivision (b) of Code of Civil Procedure section 664.5.[19] The clerk would have been required to give notice under Code of Civil Procedure section 664.5, subdivision (b) *only* if there was "a prevailing party . . . not represented by counsel" at the time of judgment. IREF claims that Mangano was, at the time of judgment, a prevailing party not represented by counsel.

IREF disputes the effectiveness of the trial court's 2008 *oral* order dismissing Mangano as a party on the ground that a *written* order is required. IREF therefore claims that Mangano remained a party at the time of judgment due to the absence of a written order dismissing him from the action. Assuming arguendo that Mangano was a *party* unrepresented by counsel at the time of the judgment, IREF's claim still cannot succeed because Mangano was not a "*prevailing* party" at the time of judgment. The jury did not return a verdict in favor of Mangano, and the court did not enter judgment in favor of Mangano. IREF argues that Mangano would qualify as a "prevailing party" if those words were given a "practical definition." None of the authorities cited by IREF on this point concerned the requirements of Code of Civil Procedure section 664.5, subdivision (b). Since the clerk, unlike a court, is performing a ministerial duty based on the face of the judgment, IREF's proposed "practical" approach to the meaning of "prevailing party" would create an impossible burden on the clerk. Code of Civil Procedure section 664.5, subdivision (b) could only be referring to the party who prevails

---

[19]   IREF seemingly acknowledges that the trial court did not "order" the clerk to mail notice of entry of judgment. The only evidence in the record on this point is the trial court's express denial that it had ordered the clerk to do so.

on the face of the judgment. Because Mangano did not prevail on the face of the judgment, he was not a prevailing party for purposes of Code of Civil Procedure section 664.5, subdivision (b), and the clerk was not required to give notice of entry of judgment. Consequently, the premise for IREF's jurisdictional contention is absent, and its contention fails.

**B. Constitutionality of Code of Civil Procedure Section 657**

Code of Civil Procedure section 657 provides that a new trial may be granted on the ground of "[i]nsufficiency of the evidence to justify the verdict or other decision . . . ." "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision. [¶] . . . [I]f the motion is granted[, the order] must state the ground or grounds relied upon by the court, and may contain the specification of reasons." An order granting a new trial on the ground of insufficiency of the evidence "shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons." (Code Civ. Proc., § 657.)

IREF contends that Code of Civil Procedure section 657's provision for the granting of a new trial based on insufficiency of the evidence is an unconstitutional violation of its right to a jury trial. "It has long been held that the right to jury trial is not violated by the power in question." (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 889 [rejecting claim under both the California and United States Constitutions].) When the California Supreme Court rejected this contention in 1915, it noted that the contention had been repeatedly rejected previously. (*In re Estate of Bainbridge* (1915) 169 Cal. 166, 167-168 [under California Constitution]; *Ingraham v. Weidler* (1903) 139 Cal. 588, 589-590 [same]; see also *Fortenberry v. Weber* (1971) 18 Cal.App.3d 213, 224 [rejecting contention under United States Constitution].) As we are

18

bound by the California Supreme Court's repeated holdings on this point over the last century (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), we need not further address IREF's contention.

### C. Merits of Order

### 1. Standard of Review

"The standards for reviewing an order granting a new trial are well settled. After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' section 657 provides:  '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . *such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons*.'  (Italics added.)  Thus, we have held that an order granting a new trial under section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.'  [Citation.]  Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .'  [Citation.]  In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.'  [Citation.]  [¶]  The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.'  [Citation.]  Therefore, the trial court's factual determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations.  [¶]  The trial court sits much closer to the evidence than an appellate court.  Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds.  The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end,

the Legislature has granted trial courts broad discretion to order new trials.  The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons.  [Citation.]"  (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411-412 (*Lane*).)  "[S]o long as the evidence can support a verdict in favor of *either* party—a properly constructed new trial order is not subject to reversal on appeal."  (*Lane*, at p. 414.)

### 2.  The Trial Court's Reasons

Pfizer's new trial motion contended, among other things, that there was insufficient evidence to support the jury's verdict and that the damages were excessive.  Hsu's new trial motion asserted, among other things, that the damages were excessive, and he joined Pfizer's motion.

The trial court found, "[a]fter weighing the evidence[,] . . . that the jury clearly should have reached a different verdict as to [Pfizer's] liability" and "as to damages."  Although the court concluded that there was sufficient evidence that *Hsu* had misappropriated IREF's trade secrets, it found that "[t]here was insufficient evidence that *Pfizer* knew, or had reason to know," that Hsu had done so, and "insufficient evidence that Pfizer acquired or used any trade secrets of IREF knowing, or having reason to know, that the information was acquired through improper means."  (Italics added.)  The court explicitly "credit[ed] the testimony of the IDMC members and Pfizer employees" that no IDMC member or Pfizer employee had ever asked Hsu to access IREF's databases or had ever had any suspicion that information provided by Hsu 'was based on improper access to IREF databases."  The court found IREF expert Teichman's testimony to be inadequate to support Pfizer's liability.  In addition, the court found that Hsu was not Pfizer's agent and that Pfizer had not conspired with Hsu.  The court took the position that "[t]he weight of the evidence established that Hsu acted without the knowledge and consent of Pfizer."

20

The trial court also found the damage award "clearly excessive." "[T]he actual loss to IREF from any misappropriation is the amount that it would have received if the data access had been purchased rather than stolen. The evidence was insufficient to show that the amount IREF would have received for granting database access in this case is anywhere near" $38 million. "Considering all of the contracts entered into by IREF, the proposals to Pfizer for the CABG-II study, and all of the other evidence in the case, it is unreasonable to conclude that the loss to IREF from any misappropriation in this case would exceed the range of $1 million to $3 million."

### 3. Analysis

Our review of appellant IREF's challenge to the trial court's new trial order in this appeal is hampered by IREF's failure to produce an appellate record that includes all of the evidence that was before the jury. Videotaped deposition testimony of numerous individuals was played for the jury at trial, but this testimony was not transcribed by the court reporter in the record of the trial. The deposition transcripts were instead marked as court exhibits. However, IREF failed to have these exhibits (or any others, for that matter) transferred to this court. (Cal. Rules of Court, rule 8.224.) Consequently, the testimony of the witnesses who testified by videotaped deposition is not part of the appellate record produced by IREF.

"It is well settled, of course, that a party challenging a judgment has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) "It is appellant's burden to demonstrate error by an adequate record [citation], and without an adequate record *we must assume facts in support of the trial court's order.*" (*Vermeulen v. Superior Court* (1988) 204 Cal.App.3d 1192, 1198-1199, italics added.) "'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Since the testimony of numerous witnesses is missing from our record, we must

21

presume that this missing testimony supports the trial court's reasons for granting the new trial motions.[20]

The trial court's theory regarding Pfizer's lack of liability was that there was insufficient evidence that Pfizer knew or had reason to know that Hsu had misappropriated IREF's information or that he had transmitted information to Pfizer acquired by improper means. The court specified that it credited the testimony of the IDMC members and Pfizer employees in this regard.

The IDMC was composed of Dr. Faich, who was the chairman of the IDMC, Hsu, Dr. Mark Newman, White, and, apparently, Berry. Of these men, only Newman testified live at trial. The videotaped deposition testimony of Berry and White was played for the jury. Hsu and Faich did not testify at trial live or otherwise. Newman testified that he was not aware of any IREF database information being provided to the IDMC by Hsu. Newman also testified that Hsu had never suggested that any information he provided to the IDMC came from IREF databases. We must presume that White and Berry also provided testimony that supported the trial court's finding that they lacked any reason to believe that Hsu was providing IREF's trade secret information to the IDMC.

Pfizer employee Hubbard testified at trial that he had never asked Hsu for any IREF database information, that Hsu had never offered him any such information, and that, to his knowledge, Hsu had never offered such information to anyone at Pfizer. Although Hsu offered comments on Pfizer's study protocol, Pfizer did not accept any of

---

[20] The missing videotaped deposition testimony included that of: Phillip Needleman, Pfizer's head of research and development; Dr. William White, a member of the IDMC; Dr. Donald Berry, another member of the IDMC; Snabes, a Pfizer employee who worked with Hubbard on CABG I and CABG II; Dr. Robert Anders, who took over for Hubbard as the director of CABG II when Hubbard was promoted; Dr. Mark Fletcher, an IDMC member who also testified at trial; Sarah Torri, a Pfizer employee who assisted the IDMC; Kenneth Verburg, a high-level Pfizer employee; Rima Veidemanis, a Pfizer employee who worked on CABG II with Hubbard and Snabes; Dr. Spickler, who ran IREF before Mangano became CEO; Daniel Canafax; and Richard Nossek.

Hsu's comments. Hsu made no references to IREF databases in his communications with Hubbard, and Hubbard had no reason to believe that any of Hsu's comments were based on IREF database information. The videotaped deposition testimony of Pfizer employees Needleman, Snabes, Anders, Torri, Verburg, and Veidemanis was played for the jury at trial, and we must presume that it, like Hubbard's testimony, supports the trial court's finding. Teichman testified that his opinion was limited to whether the information "was useful or could have been useful to Pfizer. I wasn't asked to express an opinion of whether that information was provided to Pfizer." Evidence that the information taken by Hsu "could have been useful" to Pfizer did nothing to establish that Pfizer knowingly received that information.

As to the damages award, since substantial evidence supports the trial court's finding that Pfizer did not know or have reason to know of Hsu's misconduct, there is also substantial evidence that Hsu was not acting as Pfizer's agent. Since IREF presented no evidence regarding damages that was based solely on Hsu's misappropriation of its trade secrets, it naturally follows that the trial court's grant of a new trial to Hsu on damages was supported by substantial evidence. No evidence at trial indicated that *Hsu* would have paid IREF $38 million (or any amount) for its trade secrets or that Hsu obtained $38 million in unjust enrichment as a result of his misappropriation of IREF's trade secrets.

In its opening brief, IREF purported to argue that the trial court's new trial order was an abuse of discretion because the evidence could not support a verdict for Pfizer. However, its actual arguments were based on the evidence *it* presented at trial, rather than the conflicting evidence presented by Pfizer at trial. For instance, IREF argued with regard to the agency/conspiracy issue that the court's finding was erroneous because "there was ample evidence" and "substantial evidence" to support *IREF's* claim. As Pfizer pointed out in its respondent's brief, these arguments attempted to turn the standard of review on its head. IREF's burden was to show the absence of substantial

evidence to support Pfizer's defense. It is irrelevant whether substantial evidence could support a contrary finding in IREF's favor.

In its reply brief, IREF argues for the first time that the trial court was biased against it, and therefore the order "should be vacated" or "[a]t the very least" should not be subjected to the deferential standard of review ordinarily applied to new trial orders. Appellate courts ordinarily do not consider new issues raised for the first time in an appellant's reply brief because such a tactic deprives the respondent of the opportunity to respond to the contention. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765.) It is only upon a showing of good cause for failing to raise the issues earlier that an appellate court will address issues that are initially raised in the reply brief. (*Ibid.*)

IREF argues, without any supporting documentation, that it "only learned of [the trial judge's] bias and prejudice . . . in October 2010 (several months after IREF filed its Opening Brief) . . . ." IREF claims that, more than a year after the judgment, and after the trial judge retired from the bench, the retired judge joined a law firm that had represented IREF in the early stages of this case. That law firm had withdrawn from its representation of IREF after what IREF characterizes as a "contentious relationship." IREF claims that the judge had a bias against IREF when he ordered a new trial because he *subsequently* became associated with its former law firm, which IREF assumes was biased against it. The logic of this argument escapes us, as it premised on a theory that bias may be created *retroactively*. IREF does not suggest that the judge and law firm were somehow associated at the time of or before the judge's ruling on the new trial order.

In any case, IREF has failed to show good cause for us to consider this issue notwithstanding its failure to raise it earlier. IREF filed its opening brief in July 2010. Respondents did not file their respondent's brief until January 2011. If, as IREF claims, it learned of this issue in October 2010, it could have sought leave to file a supplemental opening brief. Instead, it waited until August 2011, 10 months after it allegedly learned

24

of this issue, to raise it for the first time. Since IREF has failed to establish good cause, we decline to consider this contention.

IREF has failed to establish that the trial court's new trial order is unsupported by the record.

## D.  Exemplary Damages

IREF's new trial motion sought a new trial solely on exemplary damages. Because the trial court *granted* IREF's motion for a new trial on exemplary damages (an order that is not challenged in this appeal), IREF's appellate challenge to the trial court's failure to award exemplary damages is moot.

## IV.  Disposition

The trial court's new trial order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Elia, J.

25